Chief Judge Rader, and may it please the court, my argument today will take three parts. First, the plain language of the consulting agreement between Dr. Laux and Abbott Point of Care's predecessor, ISTAT. Second, the extrinsic evidence. And third, the denial of discovery with regard to Abbott's claim of patent infringement here. In 1999, Dr. Laux entered into what is called an exclusive consulting agreement with Abbott's predecessor, an agreement that paid him over $400,000, paid him consistent with the practices of ISTAT's senior management, gave him access to information that could arguably render him an insider for purposes of the U.S. securities laws, and continued what the agreement called an existing confidentiality agreement and provided that it continued, quote, as if Laux remained employed by the company. But it didn't just say existing agreement. It says existing agreement regarding confidentiality, non-solicitation, and non-competition. It limited the specific aspects of that existing agreement. Well, with respect, Judge Lurie, I disagree that that's limiting language. That's certainly what the district court held in this case. And that's certainly what Ipical's argument against us is. But that's not correct. In the first place, Did I read it inaccurately? Well, the language is, the existing agreement between Laux and the company regarding confidentiality, non-solicitation, and non-competition, paren, quote, the existing confidentiality agreement, end quote, shall remain in place. So it's referring now to the existing confidentiality agreement that shall remain in place as if Laux remained employed by the company. And then it goes on to say, except that certain covenants, mentioning certain covenants here, regarding non-competition shall run for 18 months after the execution of the consulting agreement. In the first place, as a matter of parsing the English language here, the existing agreement is the agreement. And the fact that it is regarding confidentiality, non-solicitation, and non-competition is a label for that singular 1984 agreement. Well, why wouldn't it have simply said, the existing agreement dated, what is it, 1984? 1984. Shall remain in place. I mean, that's not hard to do. Well, first of all, Judge Lurie, what we don't know on this record is whether there were other 1984 agreements. And consistent with the 1992 agreement, which is the one that Ibekal put primary reliance upon in the district court, and now, by the way, has told this court means something different than what it told the district court, the 1992 agreement used very similar language, calling out two particular covenants. And that language was, that certain letter agreement entered into on January 10, 1984, between the company and Dr. Lauch's concerning employee confidentiality and non-competition. Once again, it specifies two aspects of the agreement regarding, or concerning. Exactly, Judge Lurie. But now, all the parties in this case agree. Ibekal now, in its briefs before this court, and Abbott agree that that 1992 agreement carried forth the entire 1984 agreement. So that's extrinsic evidence, which, by the way, at the very least, would resolve an ambiguity if there is such an ambiguity here. But the district court didn't even rely on that. That, to me, is an error that at least gets us back into the district court for consideration of extrinsic evidence and discovery as well. There are, besides the language of section 11, Judge Lurie, there are other provisions of this agreement that confirm that the language supports the continuation of the entire 1984 silent. But the 92 agreement terminates in 95, and then we have a 99 agreement that gives him vast flexibility and does not extend to new products and does not say assignment. I think you have to deal with some of those things, too. And I'm going to, Chief Judge Rader. Let me first start with the way that you paraphrased the 1999 consulting agreement, because I think it really is the paraphrase that Ibekal would like to use, and it's basically the way the district court read it. If you look at that first sentence of section 2, and remember that section 2 is entitled consulting services. So here we're in a section of the agreement that is defining the scope of the consulting services that Dr. Lautz is going to give to ISTAT. The first sentence says, Lautz shall render exclusive, the word I mentioned earlier, exclusive consulting services to the company in connection with the manufacture and marketing of medical diagnostic products. Does not extend to work on new products, need for mutual flexibility. Right, and the important part of that is work on new products. What the district court said in this case is that the use of the term consulting agreement in the second sentence when compared to the use of consulting services in the first sentence confirmed that everything within this agreement did not extend to, quote, new products. Whether or not based on the company's core technology, whether or not the point of care blood analysis. Right. All of that says, all of that says, Chief Judge Rader, is that Dr. Lautz is not obligated to consult on new products. Again, remember the title, which IPA-Cal is very interested in using with regard to section 11 but runs away from in section 2. It's consulting services. That doesn't talk about what agreement is continued. That's in section 11. And there's other textual evidence as well that the entirety of the 1984 agreement is continued. Look at section 13, for example. That's it. I believe, oh no, I'm sorry. I'll reference another page. I don't have, it's at 232, I think, of the appendix. And it says, this arbitration provision shall not affect the company's rights under the existing confidentiality agreement to seek specific enforcement of the provisions thereof as provided therein. First point, there's no limitation. It's of the provisions thereof as provided therein. Secondly, the provision of the 1984 agreement that deals with specific performance can be found at page A232. It's the last paragraph, and under Judge Lurie, the reading that IPA-Cal and the district court have adopted here, that it's only those specific provisions. That enforcement provision would not have carried forward because it's not the, it's not a confidentiality non-solicitation or non-competition provision. That's a specific enforcement provision. That's got to be continued because the 1999 consulting agreement says that's so. And consistent with the language of that provision, section 11, consistent with section 13, consistent also with the understanding that section 2 is limited to talking about what work, with regard to new products, LAUCs was obligated to do, which is to say none. That doesn't tell us anything about the scope and the continuation of a non, of the disclosure and the assignment provisions. Now, nowhere does this 1999 agreement discuss assignments, and it didn't have to because the 1984 agreement took care of that. And we now know- Which expired in 1995, even if extended by the 1992, right? No, it was extended by the 1992 agreement, but it continued in place past 1995 into, it was in effect at the time of the 1999 consulting agreement. How do we know that? Because it's referred to very clearly in the 1999 consulting agreement, the existing confidentiality agreement. That is that same confidentiality agreement referred to in that 1992 agreement as that certain letter agreement. I don't think there's any dispute in this case with regard to that. Well, LAUCs does make assignments. He certainly does. But in every one of those assignments, he has co-inventors, and it seems to make sense that he is joining the co-inventors. This time, he's alone. I think there are a couple of things to think about here with regard to that Chief Judge Rader. First is that with regard to those assignments, they took place in a matter of weeks after that 2000 letter that we would like to have declared non-privileged and admitted to the court. And in fact, I think, I can't disclose that obviously because the issue of privilege hasn't been resolved. But suffice it to say that that will support our claim. There's a, excuse me, pardon me. With regard to those assignments also, that's under New Jersey law and under general contract law. That's extrinsic evidence of course of performance that a finder of fact could reasonably conclude shows that Dr. LAUCs was acting consistently with what we believe to be our and the correct understanding of the 1999 consulting agreement, which is to say, it incorporated entirely the 1984 letter agreement. If you're right that the 1999 agreement incorporates the 1984 agreement, then what is your view of the change in Dr. LAUCs' rights vis-a-vis his, any new inventions? He's free to work on new products. How does that impact his rights with respect to inventions? I think it's an open question as to what, quote, new products he could work on. My friend on the other side in his brief refers to garden shovels. That's a fairly easy case relative to designing point of competing point of care, excuse me, competing point of care equipment as he did here. With regard to what he could do during the term of the consultancy agreement is an issue that I think that's still open for litigation. Remember that the agreement refers to it as an exclusive consulting agreement and it continues the definition of confidential, it contains a fairly broad definition of confidential information. And that's another important point here with regard to understanding how the entirety of the 1984 agreement carries forward. Because if you look at the definition of confidential information from the 1984 agreement in the provision that all of us would agree because they say at least the confidentiality provision continues. At A230, for purposes of this agreement, confidential and proprietary information shall be deemed to include all records, data, and information coming into my possession or which I have earned or to which I have access or to which I may discover or develop as a result of my employment parent either full-time or as a consultant, close parent. So even in 1984, they're anticipating that Dr. Laux may very well become a consultant and he's going to have this obligation of confidentiality for things that he himself discovers which parallels what he has to assign to the company. Now to your point, to your specific question, Judge Bryson, what can he do? I think there's no question that he can design garden shovels. Well, yes. But the language of the consulting agreement is that he can continue to work on new products whether or not based on the company's core technology and whether or not for point-of-care blood analysis applications, right? Well, what that says is that… So presumably, that's not just garden shovels. Well, I would say, Judge Bryson, that that says this is what he's obligated to work on. That's what he's not obligated to work on. So it says the consulting agreement does not extend to work on new products. So he doesn't have to work on new products. What this doesn't say in this section 2 which defines consulting services, what it doesn't say is what he can do. What he can do is limited by the interpretation of the 1984 agreement and, you know, for example, the garden shovels one that they've used in their brief is the fairly easy one. But I think that designing products directly on our dime that directly compete that he conceived of, at least we allege, during the period of time of the consulting agreement is not within what he's allowed to do. This is not a model set of contracts that we can all agree with this. We absolutely can agree with that and that's why we needed at least extrinsic evidence and jurisdictional discovery. Let me ask you one other question before you sit down. In thinking about this shorthand, you would say shorthand, they would say express. Well, they don't say that with regard to the way it was used in the 1982 agreement. I understand, but I'm just taking the principle argument is between the two of you, I think that's a fair characterization. Is it a stretch to say that the communication and assignment requirement of the 1984 agreement is within the scope of what one would refer to at least colloquially as a non-competition covenant? That's to say I'm not going to compete with you, and one way I'm not going to compete with you is I'm not going to give your information away, that goes to confidentiality, but I'm not going to go out and get patents of my own. Right, and I think that's why you take the major covenants instead of saying, oh, all five or seven or twelve. Well, where I'm going with this is to say, is it arguable that it's not just a reference to the major covenants that necessarily includes the minor ones, but that it covers expressly the minor covenant, in this case, that's in dispute, albeit in a somewhat less than pristine, precise way? Well, again, I think if you just take the noun of the sentence and see that it's the existing agreement shall remain in place, then there's a plain language argument for us. But with regard to suggesting that, OK, let's assume that it's really meant to be limited, is the disclosure and assignment provision part and parcel of that? Absolutely it is. And not only is it part and parcel of non-competition, it's also part and parcel of the definition that I read to you from A230 with regard to confidential and proprietary information. You can't use it against us, and you certainly can't go out and get a patent on it. I've already eaten into all of my rebuttal time, I hope I'll get a few moments in response. Thank you. Could you give Mr. Downs an extra three minutes, and we'll give the summary rebuttal time back. Good morning, Your Honor. Just a second, we'll get the time right. OK, please proceed. I think there was some need to go back and look at the exact language of the agreement, because I think it's carefully written, and with respect, first of all, to— You think this is carefully written? I agree that not every piece of language is necessarily clear, but the critical ones are. It's almost by definition. When a contract comes to court, it wasn't carefully written. Let me walk through it, if I would, for a moment, Your Honor. Especially because there were some arguments made in their reply brief, which I haven't had an opportunity to address, which actually contradict a little bit of what my brother was saying today. First, there's no dispute that Dr. Laux was an important person at the company beforehand. He was the chief technology officer, vice president, head of R&D. He ceased to be an employee. It was a fundamental change in his position with the company. And he was being asked in this consultant agreement and agreed to provide consulting services only two days a week. If you look at the timing provisions in paragraph two, it's clear that they were asking only for 84 working days during the first 12 months and 44 during the last six months. It's undisputed that he was free to work to pursue his own interests, and that was a fundamental part of the deal. He's getting paid at the time for his consulting services, but he is free to work on his own interests. And the agreement is clear, as the district court said, and I think as we started out the discussion, in saying that the consulting agreement, not the services, the consulting agreement, does not extend to work on new products, whether or not based on the company's core technology and whether or not for point-of-care blood analysis applications. What was the existing agreement that was extended then in 1999? So, with respect to the continuation of certain covenants in this, if you look at A242, which is section 11 of the consulting agreement, the title is clear that it's a continuation of employee confidentiality, non-solicitation, and non-competition covenants. That is explicitly the specific covenants that dated back to the original 1984 agreement that are continued, not the others. Your Honor, Judge Rader, you are correct to say that that employment agreement terminated, it was over with the end of his employment. This is a new agreement, and it's explicit here, that the only thing that's continued from his old employee obligation are the confidentiality, non-solicitation, and non-competition covenants. Why not the, this is from the 84 letter, I also agree to assign all my rights in any inventions, improvements, or discoveries, which I may make or conceive during my employment, so forth. Why doesn't that go on? Two reasons why that was not extended. Clearly, as I said, there was a fundamental change. He was no longer full-time employed by the company. He had three out of five days a week that he was able to devote to his own interests. The agreement says it does not cover new products, does not limit him on new products, even in this area. And so what they bought with the extension of the employee confidentiality, non-solicitation, and non-competition covenants, was limits on his ability to compete, but they did not buy during the consulting period his brain and his, except to the extent he was working on their products that I'll get to in a minute, that were the old products that he was continuing to work on. So during his own, during the consulting period, when he was working for himself, he had the ability to continue to generate ideas, but he couldn't violate the non-compete provisions. The reason there's no reference to assignment in the 1999 agreement is because it was a separate covenant, the covenant to assign the inventions. And if you look at the, even their own brief talks about the 1984 agreement being broken up into specific paragraphs with different covenants. And there's the covenant of confidentiality, then non-disclosure and assignment, then competition and non-solicitation. There's distinct separate paragraphs that are different covenants. And so the agreement makes sense because he was free, and everyone acknowledged he was free, to do work on his own behalf at least three out of five days a week. And there is no continuation of the assignment agreement. And that gave him the freedom to do it, subject to the competition, from specific non-compete provisions in the employment agreement, which were extended in section 11 of the 1999 agreement for the full 18 months of the consulting period. So they bought the non-compete, but they didn't buy his brand, they didn't buy his ideas to do the consulting. Could I ask you about the 92 agreement? And turning to page A236, subsection 5C, I guess it is. Do you understand the first sentence there to refer to the entire 1994 agreement? And reading it, it says that it refers to non-observance by Dr. Laux of any of the covenants contained herein or, and here's the critical part, in that certain letter agreement entered into on January 10, 1994, between the company and Dr. Laux, concerning employee confidentiality and non-competition, the confidentiality and non-competition agreement. The language concerning employee confidentiality and non-competition in that setting, do you read that as limiting? I don't, I read the, if you read the whole phrase that you just read, your honor, the key language in my view is that any of the covenants contained herein or in that letter with a particular date, your honor. Right, but the question is then, does the language, what role does the language concerning employee confidentiality and non-competition play, i.e., is it limiting language or is it shorthand identifying language of the sort that your opposing counsel is suggesting the 99 agreement contains? Because it looks, whatever one may say of the 99 agreement, I would submit to you that this looks more like shorthand type language. You know, the position we took on appeal is that the 1992 agreement, which was seven years before the 1999 agreement, did not terminate his assignment obligations from 1984. He continued to be an employee. And the difference in 1999 is, as I pointed out, the language that specifically says we're only continuing these three specific covenants, and in 1999 it doesn't use the language of any of the covenants contained in the January 10, 1984. Yeah, this case would be over if it did. It doesn't. But the question is, what does the 92 agreement and the use of this, if it is shorthand, tell us about the way the parties refer to the 1984 agreement when they refer to it in agreements subsequent? I don't think what they wrote in 1992 really tells us anything about what happened in 1999. The circumstances were fundamentally different. But I think that the language here concerning confidentiality in addition is shorthand because it's clear that it's referring to the entire agreement. So they were using that language as shorthand. Yes. But in 1999 they were specifically continuing only the three specific covenants that were marked out. In other words, you're not arguing that concerning is limiting language. In 1992. And the 92 agreement. And I think that in the 1999 that it is limited because it's clear from the header that they're continuing only specific covenants and that doesn't have that language referring to any of the covenants contained in the January 10, 1984. If they had meant to do that, they could, like you say, Your Honor, they could have easily done it. They didn't. Instead, they were specific. They were continuing only specific covenants. And so I think that what the dis- But the language is remarkably parallel. I mean, it has one fewer referenced covenant and uses concerning instead of regarding. I'm not sure that the difference between those two words carries much weight. You know, I don't think it's – I mean, I think it's markedly different also in that it specifically says it's continuing only the three covenants, not any of the covenants. And that's in the title header of Section 11. And there's also a reason for that, given that he was free to continue to do his own business on his own behalf three out of five days a week during the consulting period. Now, in their reply brief, I think it's worth – I don't know if, Your Honor, it's a little different from what he recited. With respect to the language that says that the consulting agreement does not extend to work on new products, they agreed in their reply brief that that meant that that exempted certain products from any kind of assignment obligation, even if it existed under – Section 11 was carried forward into the 1990 consulting period. So they agreed that that's an exemption from the assignment obligation if there was one, and we don't think there was. So it's a separate ground for saying that if he was working on new products, it wasn't subject to any assignment obligation. And as Your Honor's noted, that this language about the work on new products is very broad because it says he can work on them whether or not based on the company's core technology or whether or not for point-of-care blood analysis applications. So he could develop ideas and develop his own ideas during the time period that he was consulting on new products. He wasn't limited to that. There was some emphasis in the argument about the word exclusive, saying that he was giving exclusive consulting services. The actual title of the agreement is consulting agreement, and the word exclusive only appears in the first sentence under consulting services, and it's that he's rendering exclusive consulting services to the company in connection with three specific things, all of which relate to kind of past projects that he was already working on. And one of them, Your Honor, I would note is the completion of development of coagulation products currently under development and the redesign of that. And you asked about the assignment of patents after he became a consultant, Your Honor. You asked about that? Seems to show that he feels he has an obligation, doesn't he? Well, if you actually look at those patents, Your Honor, you see one of the patents was the subject of a provisional application filed November 1, 1999, which is just two months after the consultancy period started. It was work that he was working on, and they are coagulation products, both of these patents. So they are part of the work that he did while he was still an employee. So the fact that he did some assignments on those patents later proves nothing about what this agreement says because it reflects continuation of work on the coagulation products that he had been doing as one of several inventors while he was still an employee of the company. So, Your Honor, I believe that with respect to the two key issues in the language, you don't have to find that this agreement is completely unambiguous and free of all ambiguity. But with respect to the two key issues, one is that the consulting agreement doesn't extend to the work on new products, and the second is that with respect to Section 11, there's a continuation of only those three covenants, which it explicitly states, that that is sufficient to affirm the district court and not resort to extrinsic evidence. Because the law on the extrinsic evidence is not that the district judge can never rule that a contract doesn't give ownership without going to discovery, without going to extrinsic evidence. But if the agreement is clear, the judge can decide, no, you don't own these patents, then you haven't presented evidence of it. Because ultimately, the only way Abbott can show that it owns EPCAL's patents, these are EPCAL's patents, they're assigned to us, they're owned by us, is by an assignment agreement, explicit assignment agreement in this document, and it's not there in the district judge correctly found that. If we should find that, in fact, we... Setting aside the last point that you made, which is thinking about the question of ambiguity as to the critical paragraphs, the critical selections of the consulting agreement, if we should find that that's ambiguous language, what's the proper course, would be the proper course for us to follow? There's a dispute between the parties about, you know, what happens next if we go down that road and I want to... I think, Your Honor, you would have to find that it was ambiguous with respect to both the exemption of new products and whether or not there's a continuation of an assignment covenant. Because if there's no continuation of the assignment covenant, then case over, patents never assigned. But the trial court ruled on what you listed, I think, is the second round, right? Well, actually, it looked at the agreement as a whole, which is what you're required to do. And it said, first, there is this exemption of new products. And in my view, that supports the conclusion there was no assignment obligation. And not only that, she said she would have to rewrite the language of Section 11 in order to create an assignment obligation, because Section 11 is clear that it's continuation of only of the three other covenants, not the non-solicitation and assignment paragraph. I mean, not the non-disclosure and assignment. I think I understand. So either one, if there's clarity in either one of those, then the decision should be firm. I had misunderstood what you were saying, I understand. And let's see if there's anything else Your Honors raised. I think there was a lot of emphasis in their briefs about how it wouldn't make any sense for ISTAT to have agreed to pay Dr. Lauchs all this money and let him continue to get the fruits of his ideas and conception during the consulting period. But I think that's the wrong way of looking at it. There are two parties to this contract. And obviously, Dr. Lauchs wanted to continue to work on his own behalf, and everyone recognized that he could do it. And it makes perfect sense for them to say that, all right, you can continue to work on your own behalf, but we don't want you to compete. We don't want you to violate those specific non-competition covenants, and we'll extend those during the consulting period. And that was the deal. There was no evidence that there was any deal here that the full scope of the 1984 assignment provision, which would assign any idea on any subject he ever had, including shovels, which they just gave up as long as he was an employee, there's no evidence that that full scope of the agreement was incorporated into the consulting period. And, in fact, the evidence is all to the contrary. He had the freedom to work on his own, that only certain covenants were continued, and that new products and new product ideas, even in this space, competitive space, were exempt from the consulting agreement. Thank you. Thank you. You have three minutes. Thank you very much, Your Honor. What I have not heard an answer to this morning is why the parties would have used this shorthand language, as you used the term, Judge Bryson, in 1992, but used shorthand language to only refer to certain covenants in 1999. Under New Jersey law, the party's usage is the sort of extrinsic evidence which is always admissible to understand what a contract means. And that's exactly the sort of evidence that was never even considered by this ruling in this regard. If we were making fundamental changes in 1999, then how come the 1999 agreement says, the existing agreement shall remain in place, not certain covenants of the existing agreement, or these paragraphs of the existing agreement, or simply rewrote the agreement to say these are the only things that are being continued. Instead, it continues the existing agreement. And Judge Bryson, to a further point with regard to our colloquy earlier during my opening presentation about how you might read the term confidentiality or non-competition, I think that the Stanford decision from the Supreme Court this week, which affirmed a case that they relied on in the district court against us, dealt with an agreement called a visitor's confidentiality agreement. That was the name of it. Yet, it contained for a visitor to the Cetus Lab, a provision that said you have to, and indeed do, assign what you find out here to us. And that was for a visitor. Why wouldn't it be for a consultant? It makes perfect sense that a consultant, much like a visitor, would have that obligation. My friend's argument with regard to Section 11, he's very fond of looking at the title, but not the text of that provision. And when it comes to Section 2, he's very fond of looking at the text, but not the title of that provision. If that doesn't show that there's at least an ambiguity here with regard to these contracts that entitles us to a remand, then I'm not sure whether we could ever show an ambiguity in a document. But I think Judge Bryson, your initial comment to my friend is right. This is not, particularly when you try to put all the pieces together, the most carefully written piece of document or documents in the world. Well, we're not grading papers here. No, we're not grading papers. But we are trying to understand what the intent of the parties was. And we have their language. And had the district court properly considered it, we have the surrounding circumstances, which under New Jersey law can be used to understand, not vary and not add to, but to understand the agreement. Finally, to your question of my opponent, Judge Bryson, about what do we do from here. We think at the very least we get a remand to the trial court. We should get, as in the DDB case, some discovery aimed at the jurisdictional issues. The intent of the parties would be the focus of this discovery. What was the usage? What was the negotiating history? Can we have the depositions of the people who were involved? And, of course, we want that 2000 letter, whose contents are generally reflected in that 2007 memorandum, which is not the subject of privilege and which is in the record, unless the court has further questions. I thank you for your indulgence and the additional time, Chief Judge Rader. Thank you. Our next case is AIANG.